# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Mario Lazaro Santos-Hunter (1),

        Defendant.

Case No. 23-cr-310 (DWF/DJF)

**ORDER
AND
REPORT AND RECOMMENDATION**

## INTRODUCTION

This matter is before the Court on Defendant Mario Lazaro Santos-Hunter's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("First Motion to Suppress Evidence") (ECF No. 20), Motion to Suppress Statements, Admissions, and Answers ("Motion to Suppress Statements") (ECF No. 21), and Supplemental Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Supplemental Motion to Suppress Evidence") (ECF No. 33).[1] The Court held a hearing on Mr. Santos-Hunter's motions on December 29, 2023. (ECF No. 39.)[2]

---

[1] The undersigned United States Magistrate Judge considers this matter pursuant to a general referral in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1.

[2] Mr. Santos-Hunter filed his first two suppression motions (ECF Nos. 20, 21) and a Motion to Dismiss Count Three of His Indictment ("Motion to Dismiss") (ECF No. 19) on November 14, 2023. On November 28, 2023, the Government filed a responsive memorandum and argued that no evidentiary hearing was necessary because Mr. Santos-Hunter did not raise any genuine factual dispute. (ECF No. 25.) Following additional briefing focused solely on whether the Court should hold an evidentiary hearing, the Court ruled on December 20, 2023 that it would hold an evidentiary hearing on December 29, 2023. (ECF No. 32.) Later that same day, Mr. Santos-Hunter filed his Supplemental Motion to Suppress Evidence, which included a request for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (ECF No. 33.) The Court did not hold a *Franks* hearing but did hear testimony related to the issues Mr. Santos-Hunter raised in his Supplemental Motion to Suppress during the evidentiary hearing on December 29, 2023. (ECF No. 39.) As discussed below, the Court now finds that a *Franks* hearing is warranted. This Report

Daniel P. Huddleston appeared on behalf of Mr. Santos-Hunter. (*Id.*) Raphael Coburn appeared on behalf of the Government. (*Id.*) Based on the parties' written submissions, hearing testimony, and on the entire file, the Court recommends Mr. Santos-Hunter's First Motion to Suppress Evidence and Motion to Suppress Statements be denied and orders a *Franks* hearing to address his Supplemental Motion to Suppress Evidence.

## BACKGROUND

The Government charged Mr. Santos-Hunter with Possession with Intent to Distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c) ("Count 1"), Illegal Possession of Machine Guns in violation of 18 U.S.C. §§ 922(o)(1) and 924(a)(2) ("Count 2"), and being a Felon in Possession of Firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) ("Count III") ("Indictment") (ECF No. 1). The charges stem, in part, from an April 12, 2023 Warrant to track a phone number associated with Mr. Santos-Hunter ("Aril 12, 2023 Warrant") (Gov't Ex. 1), a May 10, 2023 Warrant to search an apartment allegedly associated with Mr. Santos-Hunter ("May 10, 2023 Warrant") (Gov't Ex. 2), and statements Mr. Santos-Hunter made to police on May 19, 2023 during an interview after he was arrested (Gov't Ex. 3).

### A.    The April 12, 2023 Warrant

On April 12, 2023, Investigator Cody Amberg of the New Brighton Police Department and the Ramsey County Violent Crime Enforcement Team applied for and received a warrant related to mobile telephone number XXXXXX-2700 ("Phone Number"). (Gov't Ex. 1.) Investigator Amberg requested authorization for the installation and use of an electronic tracking device

---

and Recommendation addresses only Mr. Santos-Hunter's suppression motions and his request for a *Franks* hearing. The Court addressed his Motion to Dismiss in a separate Report and Recommendation. (ECF No. 42.)

/Global Position System (GPS) on that Phone Number as well as a pen register and trap and trace device.  (*Id*. at 1-2.)  Investigator Amberg's application included a four-page supporting affidavit ("April Affidavit") (*id.* at 2-6).  The April Affidavit explained that Investigator Amberg was an investigator who had been a police officer since 2014 and had extensive training involving the illegal possession and trafficking of controlled substances.  (*Id.* at 2.)  The April Affidavit also detailed Investigator Amberg's investigation of a drug trafficking ring that allegedly trafficked tens of thousands of M30 fentanyl pills from Arizona for distribution in Minnesota.  (*Id*. at 2-4.)  According to the April Affidavit, the investigation: (1) focused on three individuals—Quijuan Bankhead, Robiel Williams, and Montez Chandler, Jr; (2) spanned from August 2022 through at least February 2023; (3) included the use of a confidential informant ("CI"), electronic tracking, interception of a postal package containing 49,000 fentanyl pills; and (4) included a search of Mr. Bankhead's home and cell phone on February 27, 2023.  (*Id.* at 3-4.)

The April Affidavit stated that upon reviewing the data extracted from Mr. Bankhead's cellphone, Investigator Amberg "observed numerous drug related conversations with multiple identified and unidentified individuals," including a Facebook conversation between Mr. Bankhead and Mr. Santos-Hunter on January 5, 2023.  (*Id.* at 4.)  In that exchange, Facebook user "Mario Santos" wrote to Mr. Bankhead, "'n if u wanna do that still we can today" "trade".  (*Id.*)  Mr. Bankhead replied, "It's cool imma pass and not on fb bro lol."  (*Id.*)  Facebook user "Mario Santos" replied, "ya that y I ain't say to much."  (*Id.*)  The April Affidavit explained that, based on Investigator Amberg's training and experience, this exchange was consistent with how drug

traffickers take precaution not to discuss their transactions on Facebook or other social media platforms.  (*Id.*)

The April Affidavit also stated that on March 23, 2023, Investigator Amberg provided a CI with a Minnesota ID photograph of Mr. Santos-Hunter without any name or identifying features, and that the CI confirmed the man in the photograph was Mr. Santos-Hunter and also provided Mr. Santos-Hunter's Facebook username.  (*Id.*)  The April Affidavit detailed how the CI used Facebook to show investigators photographs of Mr. Santos-Hunter "posing with large amounts of US Currency."  *Id.*  It also provided that the CI "told investigators [Mr. Santos-Hunter] was also involved in the distribution of controlled substances."  (*Id.*)  The April Affidavit further said Investigator Amberg had "been provided information in the past from the CI which [was] deemed reliable."  (*Id.*)

Finally, the April Affidavit provided that on April 12, 2023, a probation officer advised Investigator Amberg that Mr. Santos-Hunter was using the target Phone Number.  (*Id.* at 4.)  The April Affidavit explained that, based on Investigator Amberg's training and experience, drug dealers "use cellular phones to facilitate the possession and sale of controlled substances," and that tracking the target Phone Number would assist law enforcement with "identifying other co-conspirators, unidentified narcotic stash houses, and narcotic transactions with other customers around the Twin Cities metro and beyond."  (*Id.* at 5.)

**B.    The May 10, 2023 Warrant**

On May 10, 2023, Investigator Amberg applied for and received a warrant to search an apartment located at 11YYYY Anderson Lakes Parkway #ZZZ, Eden Prairie, MN ("Apartment"), and to seize assorted items including cell phones, records, firearms, paraphernalia, and money.  (Gov't Ex. 2.)  The warrant application included an affidavit containing many of the same

allegations supporting the April Affidavit ("May Affidavit") (*id.* at 2-7).  It also added new information including, for example, that based on GPS location data obtained through the April 12, 2023 Warrant, "electronic surveillance routinely placed [Mr. Santos-Hunter] in the area of the Lake Place Apartments at 11[YYYY] Anderson Lakes Parkway."  (*Id*. at 5.)  The May Affidavit explained that commercial records showed the Phone Number Mr. Santos-Hunter was using "was subscribed to a Shaunice Marie Dodd" and this "real-time commercially available check revealed [Ms. Dodd] resided at 11[YYYY] Anderson Lakes Parkway" at a specific unit. (*Id.* at 4.)  The May Affidavit further added that the property director of the Apartment complex confirmed Mr. Santos-Hunter had a child with Ms. Dodd, regularly stayed at Ms. Dodd's apartment, and routinely drove her black Lincoln Sedan.  (*Id.* at 5.)  The May Affidavit also stated that on May 9, 2023, electronic surveillance showed Mr. Santos-Hunter carrying numerous bags and clothing to the third floor of the Apartment complex.  (*Id.*)

The May Affidavit additionally cited an incident on April 24, 2023, during which police officers were dispatched to investigate an unconscious person in a car stopped on the road.  (*Id.*) The May Affidavit states officers observed Mr. Santos-Hunter slumped over in the driver's seat of Ms. Dodd's black Lincoln sedan and commanded him to exit.  (*Id*.)  Instead of exiting, however, he fled, crashed into a motorcycle, and then fled again.  (*Id.*)

The May Affidavit further provided that on "May 10, 2023, DEA Task Force Officer Mark Altendorfer conducted an open-air sniff with his narcotics certified K9 Molly at 11YYYY Anderson Lakes Parkway."  (*Id.*)  The May Affidavit stated that K9 Molly alerted to the presence of narcotics outside the Apartment, but she did not alert on any adjacent apartments.  (*Id.*)  Though Investigator Amberg authored the May Affidavit, which included numerous allegations detailing

his personal involvement in the investigation, it did not suggest he was present for K9 Molly's sniff outside the Apartment. (*See* Gov't Ex. 2 at 2-7.)

The May Affidavit included no data related to K9 Molly's reliability, but it did state "K9 Molly is certified by the National Police Canine Association" to detect narcotics. (*See id.* at 2-7.) The parties agree this representation was erroneous. The record reflects that K9 Molly was not certified by the National Police Canine Association on May 10, 2023; rather, she was certified by the United States Police Canine Association at that time, and she was recertified by the same association on the day after the alleged sniff. (Gov't Ex. 6 at 5-6.)

Hennepin County District Judge Peter A. Cahill issued the warrant on May 10, 2023 (*id.* at 9-11), and law enforcement executed it on May 18, 2023 (ECF No. 51 at 79, Hearing Testimony). During the search, law enforcement officers located three firearms and approximately 300 M30 pills containing fentanyl. (*Id.; see also* ECF No. 1.)

### C.    Hearing Testimony Regarding the Sniff

During the evidentiary hearing on Mr. Santos-Hunter's motions, Deputy Altendorfer testified regarding K9 Molly's May 10, 2023 positive alert for narcotics. (ECF No. 51 at 9-12.) Deputy Altendorfer testified that he "gave the command to K9 Molly to seek dope," after which "[s]he entered the hallway, crossed the hallway to the other side, checked an unrelated address door with no indication, made her way down toward the target residence[.]" (*Id.* at 11:13-16.) According to Deputy Altendorfer, "[a]s she was passing the door, she caught an odor that she then started coming back toward the target residence door to.[3] When she got back to that door, she continued to narrow her smelling area so that she got to the door seam and then sat," which Deputy Altendorfer explained was positive alert to a narcotic odor. (*Id.* at 11:16-11:20; 12:4-8.) Deputy

---

[3] As reflected in the hearing transcript.

Altendorfer testified that when K9 Molly turned toward the door "[h]er behavior, her respirations, her body language changed and reflected behavior that is consistent with her being in narcotic odor." (*Id.* at 12:1-12:3.)

Deputy Altendorfer did not write a report documenting the alleged sniff until June 14, 2023—more than a month after it allegedly occurred. (*Id.* at 53:17-19; *see also* Gov't Ex. 4, "Sniff Report".) His Sniff Report, in its entirety, states the following:

> On May 10, 2023 I, Deputy Altendorfer, deployed my canine partner Molly at [the Apartment] for an open air sniff of the common area of the building. Officer Amberg, I and canine Molly entered the multi unit residential complex and I directed canine Molly to, "Seek Dope". As we navigated to the suspected residence of [the Apartment] canine began checking for the presence of narcotic odor coming from the apartments. As we approached [the Apartment], canine Molly alerted to the presence of narcotic odor coming from [the Apartment]. During the open air sniff canine Molly only alerted to [the Apartment]. K9 Molly is certified by the United States Police Canine Association as recently as May 2023.

Deputy Altendorfer conceded that this single paragraph Sniff Report does not discuss K9 Molly's respirations or describe how her behavior changed in the hallway. (ECF No. 51 at 55:17-19. 56:7-12; *see also* Gov't Ex. 4, Sniff Report.)

Deputy Altendorfer also testified he maintains a detailed log of K9 Molly's training exercises and deployments, but that this log does not include an entry recording any deployment on May 10, 2023. (ECF No. 51 at 22:3-4; *see also* Gov't Ex. 5, K9 Molly's "Training Log".) He testified he does not log every training session or deployment because, "'[l]ogistically, it is sometimes difficult to get every single deployment on the logs, just due to the nature of my ancillary duties." (ECF No. 51 at 21:14-16.) He explained that he spends very limited time in the office in front of his computer, and he can only update the deployment log from his computer at the office. (*Id.* at 32:25-33:4, 57:21-58:9.) He testified that logging a training or deployment requires him to type information into a spreadsheet, but conceded he logged a deployment on

May 14, 2023—just four days after K9 Molly's alleged deployment at the Apartment—and did not update the log to include the positive alert described in his Sniff Report. (*Id.* at 31:15-17, 64:14-16; *see also* Gov't Ex. 5 at 11, K9 Molly's Training Log.)  Deputy Altendorfer testified there is no video or audio footage of the alleged sniff. (ECF No. 51 at 51:19-52:20.)

During the hearing, defense counsel questioned Deputy Altendorfer about K9 Molly's training and capabilities.  Deputy Altendorfer testified that in the months following the alleged sniff, K9 Molly underwent a reintroduction to odor recognition training and was required to participate in remedial training after falsely alerting in training on substances she was not trained to detect. (*Id*. at 46:6-12.)  Deputy Altendorfer further acknowledged K9 Molly is not certified to detect fentanyl, but he stated he had used fentanyl in non-blinded training exercises with her. (*Id.* at 28:23-25; 29:9-30:6.)  The record contains no information regarding the accuracy of K9 Molly's fentanyl detection skills exhibited during these exercises, and K9 Molly's Training Log includes no reference to fentanyl—whether in pill or powder form—in her training exercises or deployments. (*See* Gov't Ex. 5, listing training aids used as including cocaine, meth, crack, marijuana, THC, MDMA, heroin, and circulated and uncirculated currency.)

Both Deputy Altendorfer and Investigator Amberg testified Investigator Amberg was present during the sniff at the Apartment. (*Id.* at 60:4-9; 98:8-11.)  Investigator Amberg said he saw K9 Molly "sit at the door" outside the Apartment to indicate the presence of narcotics but that she did not alert on any other apartments. (*Id.* at 68:16-69:3.)  He testified he documented K9 Molly's sniff on the day it occurred by describing it in the May Affidavit in support of the search warrant. (*Id.* at 98:8-15.)  Investigator Amberg denied that the May Affidavit was the only place he documented the sniff, stating he also wrote about it in a report. (*Id.* at 100:11-13, "Q. Investigator Amberg, the only place you documented the dog sniff was in the search warrant you

wrote?  A. No. It was documented in the report as well.")  On questioning, however, he could not

recall the exact date he wrote the report, or whether he wrote it before or after Mr. Santos-Hunter's

arrest.  (*Id.* at 100:14-20, "I don't know the exact date when I wrote that, no.".)  The record includes

no such report, and the Government appears to concede none exists.  (ECF No. 52 at 11, stating

the sniff was documented in "two ways": the May Affidavit and Deputy Altendorfer's Sniff

Report.)

### D.    May 19, 2023 Interview

On May 19, 2023, Investigator Amberg questioned Mr. Santos-Hunter while he was in

custody.  (Gov't Ex. 3.)  Prior to providing a warning under *Miranda v. Arizona*, 384 U.S. 436

(1966), Investigator Amberg asked Mr. Santos-Hunter his name, age, where he resided and the

address, his marital status, whether he was employed and his employer's address, his phone

number, and the last grade he completed.  (Gov't Ex. 3 at 0:55-2:10.)  Investigator Amberg then

read Mr. Santos-Hunter his *Miranda* rights and began questioning him about the case.  (*Id.* at 2:28-

3:23.)  Approximately one minute later, Mr. Santos-Hunter asked for a lawyer.  (*Id.* at 4:16-4:24;

*see also* ECF No. 59 at 83.)  Investigator Amberg clarified Mr. Santos-Hunter's request for an

attorney (*id.* at 4:25-4:29), heeded the request, and stopped questioning Mr. Santos-Hunter about

the case (*id.* at 4:30).  Investigator Amberg then proceeded to obtain a DNA sample pursuant to a

search warrant (*id.* at 4:31).  He asked Mr. Santos, "You ever done a DNA sample before?"  (*Id.*

at 6:31.)  Mr. Santos-Hunter responded affirmatively.  (*Id.* at 6:33.)  During the DNA collection

process, Mr. Santos-Hunter spontaneously asked Investigator Amberg what was happening with

"Shaunice's" phone, explaining the owner of the phone wanted it back.  (*Id.* at 8:50-9:10.)

Investigator Amberg responded "Whose phone is it?"  (*Id.* at 9:11-9:12.)  Mr. Santos-Hunter

replied that it was Ms. Dodd's phone.  (*Id.* at 9:12-9:14.)  Investigator Amberg told Mr. Santos-

Hunter he was probably writing a warrant for the phone and said they would figure it out.  (*Id.* at 9:14-9:20.)  He then asked if Mr. Santos-Hunter had "chatted with her though."  (*Id.* at 9:30.)  Mr. Santos-Hunter replied that someone else told him Ms. Dodd was asking about her keys and phone.  (*Id.* at 9:32-9:40.)  Mr. Santos-Hunter seeks to suppress all statements made during the May 19, 2023 before Investigator Amberg provided the *Miranda* warning and after Mr. Santos-Hunter requested an attorney.  (ECF No. 51 at 107:1-7.)

## DISCUSSION

Mr. Santos-Hunter's Motion to Suppress Evidence (ECF No. 20) and Supplemental Motion to Suppress Evidence (ECF No. 33) ask the Court to suppress evidence obtained from the April 12 and May 10 Warrants, respectively, because: (1) the April 12 Warrant lacked probable cause; and (2) both warrants violated his Fourth Amendment rights as recognized in *Franks v. Delaware*, 438 U.S. 154 (1978).  (ECF No. 48 at 9-38; ECF No. 54 at 1-14.)  Mr. Santos-Hunter initially requested a *Franks* hearing as part of his Supplemental Motion to Suppress Evidence (ECF No. 33), but now contends the December 29, 2023 evidentiary hearing sufficiently addressed his *Franks* challenges and asks the Court to apply the post-hearing standard.  (ECF No. 48 at 5 n.2.)

Mr. Santos-Hunter's Motion to Suppress Statements (ECF No. 21) asks the Court to suppress his May 19, 2023 custodial statements.  Mr. Santos-Hunter argues Investigator Amberg violated his Fifth Amendment *Miranda* rights by questioning him initially without a *Miranda* warning and later after he requested an attorney.  (ECF No. 48 at 39-41; ECF No. 54 at 14-17.)

## I.    Legal Standards

### A.    Suppression of Evidence for Lack of Probable Cause

The Fourth Amendment dictates that "no warrants shall issue, but upon probable cause." The standard for determining whether a search warrant is supported by probable cause is well

established:

> Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances.  If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established.

*United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016) (quotations and citations omitted).

"An issuing judge's 'determination of probable cause should be paid great deference by reviewing courts' and should be upheld if the judge had a 'substantial basis for … conclud[ing] that a search would uncover evidence of wrongdoing.'"  *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (alterations in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  When "the issuing judge relied only on the affidavit submitted with the warrant application to issue the warrant, a reviewing court may only use the information 'found within the four corners of the affidavit' in determining if probable cause existed."  *United States v. Eggerson*, 18-cr-110 (DWF/KMM), 2018 WL 6520648, at *3 (D. Minn. Sept. 27, 2018) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)), *report and recommendation adopted*, 2018 WL 5962481 (D. Minn. Nov. 14, 2018), aff'd, 999 F.3d 1121 (8th Cir. 2021). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]"  *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citation omitted). "However, judges are permitted to 'draw reasonable inferences from the totality of the circumstances' when making the probable cause determination."  *Id*. (quoting *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017)).

Even if a search warrant lacks probable cause, "[u]nder the good-faith exception, evidence seized pursuant to [the warrant] is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable."  *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008)

(citation omitted). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *Id.* (quotation omitted) (alteration in original). To assess the objective reasonableness of the executing officer, courts look to the totality of the circumstances, including information known to the executing officer but not presented to the issuing judge. *Id.* (citation omitted). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *United States v. Leon*, 468 U.S. 897, 921 (1984). However, *Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid. *United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007).

### B.    *Franks* Challenge

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant "may request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). A defendant "is entitled to a hearing only if he satisfies two criteria: (1) 'a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless regard for the truth, was included by the affiant' in the supporting

12

affidavit, and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Patterson*, 68 F.4th 402, 414 (8th Cir. 2023) (quoting *Franks*, 438 U.S. at 155-56).

When a defendant seeks a *Franks* hearing based on omissions from a warrant affidavit, the "defendant must make a substantial preliminary showing that there was an intentional or reckless omission from a warrant affidavit that was necessary to the finding of probable cause." *United States v. Hansen*, 27 F.4th 634, 637 (8th Cir. 2022). "To prevail, a defendant must show more than negligence or an innocent mistake." *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010). But "[r]ecklessness … may be inferred from the fact of omission of information from an affidavit … when the material omitted would have been clearly critical to the finding of probable cause.'" *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010) (quotation marks and citation omitted). "Reckless disregard for the truth" may also exist when "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010); *see also United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (an officer acts recklessly by withholding information that any "reasonable person would have known that this was the kind of thing the judge would wish to know").

The requirement of a substantial preliminary showing "is not lightly met". *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998) (citation omitted). It requires more than allegations; a defendant satisfies this standard only by making an offer of proof, through affidavits or other similarly reliable evidence. *Franks*, 438 U.S. at 171.

If a defendant does satisfy the substantial preliminary showing that a hearing is warranted, he may be entitled to relief if he establishes by a preponderance of the evidence that his allegation

of perjury or reckless regard for the truth is supported and that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Id.* at 156. In the case of an omission, suppression is appropriate "only if the affidavit as supplemented by the omitted material could not have supported the existence of probable cause." *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986) (emphasis in original). In either a case, the Court must void the search warrant and exclude the fruits of the search "to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 171.

### C.    Suppression of Statements

The Fifth Amendment requires law enforcement officers to inform a person of his or her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), before beginning a custodial interrogation. *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007); *see also United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) ("The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning.") *Miranda* warnings must be given whenever a suspect is interrogated while in custody. *Griffin*, 922 F.2d at 1347. But "[i]t is well-settled that routine biographical data is exempt from Miranda's coverage …." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996); *see also United States v. Armstrong,* 39 F.4th 1053, 1056 (8th Cir. 2022) (recognizing a "routine booking question" exception to *Miranda*). The Eighth Circuit defines "interrogation" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Armstrong*, 39 F.4th at 1056.

The *Miranda* rule also provides that when a suspect in custody requests an attorney, any law enforcement efforts to interrogate him outside the presence of counsel must immediately

cease. *Miranda*, 384 U.S. at 474. A failure to provide *Miranda* warnings when required, or to cease interrogation after a defendant invokes his right to counsel, dictates that the defendant's custodial statements must be suppressed. *Id.* at 479.

While the *Miranda* rule applies to responses to interrogatory questions, it does not apply to a "voluntary statement made by a suspect, not in response to interrogation … with or without the giving of *Miranda* warnings." *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (quotation omitted). Requests for clarification of a detainee's spontaneous statements generally do not constitute interrogation. *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 23 2005).

## III. Motion to Suppress Evidence

Mr. Santos-Hunter's Motion to Suppress Evidence asks the Court to suppress evidence obtained from the April 12, 2023 warrant on the grounds that it: (1) lacked probable cause and; (2) violated his rights under *Franks*. (ECF No. 48 at 9-24; ECF No. 54 at 1-7.)

### A. Probable Cause

Mr. Santos-Hunter contends the cellular tracking, pen register and trap and trace data from the Phone Number used by Mr. Santos-Hunter, as well as any evidence derived from that data, must be suppressed because the April Affidavit: (1) failed to establish probable cause Mr. Santos-Hunter was involved in any criminal activity; and (2) did not establish the necessary nexus between any suspected criminal activity and the target Phone Number. (ECF No. 48 at 9-17; ECF No. 54 at 1-3.) He also argues the *Leon* good faith exception does not apply because the April Affidavit

was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  (ECF No. 48 at 22-24; ECF No. 54 at 7-8.)

### 1.    Criminal Activity

Mr. Santos-Hunter claims the basis for Investigator Amberg's belief that Mr. Santos-Hunter was involved in criminal activity was derived exclusively from: (1) his investigation into Mr. Bankhead's drug trafficking ring and the January 5, 2023 Facebook messages between "Mario Santos" and Mr. Bankhead; and (2) a tip from a CI.  (ECF No. 48 at 10.)  Mr. Santos-Hunter argues it is unclear from the Facebook messages that the "trade" mentioned in the messages referred to narcotics, and even if it did, Mr. Santos-Hunter's digital proximity to Mr. Bankhead shows only "mere association" with Mr. Bankhead and cannot support probable cause.  (ECF No. 48 at 11, citing *United States v. Everroad*, 704 F.2d 402, 406 (8th Cir. 1983).)  Mr. Santos-Hunter further argues the CI's vague tip that Mr. Santos-Hunter "was involved in the distribution of controlled substances" was insufficient to establish probable cause.  He contends the tip cannot be rescued by the corroborating allegation that law enforcement identified "other photographs of [Mr. Santos-Hunter] posing with large amounts of US Currency" since the April Affidavit provides no information regarding where or when the photographs were taken.  (ECF No. 48 at 14.)  He similarly contends the affidavit's bare-bones assertion that the CI had previously provided reliable information was conclusive and insufficient to support any belief that the CI's information was accurate.  (ECF No. 48 at 15.)  Mr. Santos-Hunter argues that, even viewed together, the Facebook

messages and the CI's uncorroborated tip did not establish probable cause Mr. Santos-Hunter was engaged in criminal activity.  (ECF No. 48 at 15-16.)

### 2.    Nexus

Mr. Santos-Hunter also argues the April 12, 2023 warrant failed to establish an adequate nexus between the alleged distribution of controlled substances and the information requested from the target Phone Number.  (ECF No. 48 at 16-27.)  He claims that, notwithstanding Investigator Amberg's statement that drug dealers "use cellular phones to facilitate the possession and sale of controlled substances", the April Affidavit did not suggest Mr. Santos-Hunter was actually using the target Phone Number to distribute controlled substances.  He notes that it did not allege: (1) there were text messages or calls between the target Phone Number and Mr. Bankhead relating to controlled substances; or (2) the CI had coordinated the purchase or sale of controlled substances with someone using the target Phone Number.  (ECF No. 48 at 16-17.)

### 3.    Good-Faith Exception

Mr. Santos-Hunter contends the good-faith exception does not apply because the "affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  (ECF No. 48 at 22-23.)  He relies on *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000), in which the Eight Circuit held reliance on a warrant's validity was entirely unreasonable when the affidavit "focused suspicion of illegal activity solely on a separate suspect … [and] [t]he only connections between [the defendant] and the primary suspect were, according to the affidavit, wholly innocent …." *United States v. Carpenter*, 341 F.3d 666, 672 (8th Cir. 2003) (discussing *Herron*).  Mr. Santos-Hunter contends that, like the *Herron* defendant, he played only a small part in the conduct alleged, such that law enforcement could not reasonably have relied on the issuing court's probable cause determination.  (ECF No. 48 at 23-24.)  Mr. Santos-Hunter

further contends the April Affidavit failed to establish a sufficient nexus to the target Phone Number for law enforcement to rely on it.  (ECF No. 54 at 16.)

### 4.    Analysis

For the reasons given below, the Court finds the April Affidavit provided the issuing court with at least a "substantial basis" to conclude that the April 12, 2023 warrant would uncover evidence of wrongdoing.  *Stevens*, 530 F.3d at 718.  First, the Facebook messages established a clear connection between Mr. Santos-Hunter and Mr. Bankhead, a known drug trafficker.  The messages: (1) reference a "trade"; (2) include an instruction not to discuss that "trade" on Facebook; and (3) show Mr. Santos-Hunter's agreement and acknowledgment that he "ain't say to much."  (Gov't Ex. 1 at 4.)  Investigator Amberg attested that such conversations are consistent with precautions drug traffickers take to avoid discussing drug transactions on Facebook or other social media platforms.  (*Id.*)  The Court finds it reasonable to infer that a "trade" with a known drug dealer involved illicit activity when, as in this case, the participants actively sought to conceal it.

Furthermore, the April Affidavit stated that a reliable CI: (1) identified Mr. Santos-Hunter as being involved in controlled substance distribution; and (2) directed law enforcement officers to his Facebook page, where they observed photographs of Mr. Santos-Hunter posing with large amounts of U.S. currency.  (*Id.*)  "[W]hen probable cause depends on information provided by a source, the determinative factor is … 'whether the information is reliable.'"  *United States v. Evans*, 4 F.4th 633, 637 (8th Cir. 2021) (quoting *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013)).  "Information may be sufficiently reliable to support a probable cause finding if ... it is corroborated by independent evidence."  *Keys*, 721 F.3d at 518.  "When some information is independently corroborated, it is permissible for the issuing judge to conclude that the informant

and the remaining information provided are reliable, even if uncorroborated." *Evans*, 4 F.4th at 637 (citation omitted). "[C]orroboration of minor, innocent details can suffice to establish probable cause." *Keys*, 721 F.3d at 518 (quotations omitted).

The April Affidavit established sufficient corroboration to support reliance on the CI's claims. It explained that the CI identified Mr. Santos-Hunter from a photograph that did not include any names or other identifying information and then directed law enforcement to Mr. Santos-Hunter's Facebook profile. Both the identification and the Facebook information established the informant's preexisting knowledge of Mr. Santos-Hunter. (Gov't Ex. 1 at 4.) These circumstances, viewed together with Investigator Amberg's assertion that the CI had previously provided reliable information, bolster the conclusion that the CI was reliable. Although the Facebook photos of Mr. Santos-Hunter posing with large amounts of U.S. currency were undated, they contributed to the totality of the circumstances that Mr. Santos-Hunter was involved in criminal activity. *Notman*, 831 F.3d at 1088 (probable cause is determined by the considering the totality of the circumstances).

The Court further finds the April Affidavit established a sufficient nexus to support tracking the target Phone Number. The April Affidavit provided that on April 12, 2023—the same day the April 12, 2023 Warrant was issued—a probation officer advised Investigator Amberg that Mr. Santos-Hunter was using the target Phone Number. (Gov't Ex. 1 at 4.) The April Affidavit also explained that, based on Investigator Amberg's training and experience, drug dealers "use cellular phones to facilitate the possession and sale of controlled substances," and tracking the target Phone Number would assist law enforcement with "identifying other co-conspirators, unidentified narcotic stash houses, and narcotic transactions with other customers around the Twin Cities metro and beyond." (*Id.* at 5.) The Court finds these allegations were sufficient to support

the issuing judge's determination that the requisite nexus was established. Though the nexus might have been stronger had the April Affidavit alleged specific narcotics trades using the target Phone Number, that it did not include such additional facts is not dispositive. *Howe v. Gilpin*, 65 F.4th 975, 980 (8th Cir. 2023) (quotation omitted) (A warrant affidavit "need only show facts sufficient to support a finding of probable cause.").

Based on all the circumstances in totality, the Court finds the issuing judge drew reasonable inferences to support findings that: (1) Mr. Santos-Hunter was engaged in illegal drug trafficking; and (2) tracking data from the target Phone Number would lead to evidence of suspected drug trafficking. *Tellez*, 217 F.3d at 550. The Court thus concludes the April Affidavit established at least a "substantial basis" for the issuing judge to find probable cause to issue the April 12, 2023 warrant.

Mr. Santos-Hunter cites *United States v. Everroad* for the proposition that the facts in this case support only a "mere association" with a known drug trafficker and do not establish probable cause. As a threshold matter, the Court notes that *Everroad* involved a challenge to a warrantless arrest rather than a search warrant reviewed and signed by a judge. 704 F.2d at 405. The facts in that case also differ significantly. In *Everroad*, the Eighth Circuit held there was no probable cause to arrest the defendant based on his mere presence in a car with someone who was involved in a drug transaction and continued presence in the area when more drugs were to be delivered. 704 F.2d at 406. In contrast, the April Affidavit cited specific facts connecting Mr. Santos-Hunter with narcotics trafficking, including the tip from the CI and Mr. Santos-Hunter's statements regarding

a trade with a known drug dealer. *Everroad* is thus distinguishable and does not dictate a different conclusion.

The record also supports a finding that the officers were acting in good-faith reliance on the issuing judge's probable cause determination. *See Leon*, 468 U.S. at 921. Mr. Santos-Hunter claims the good-faith exception should not apply because the April Affidavit "was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (ECF No. 48 at 23.) But for the reasons discussed above, the Court finds under the totality of the circumstances that the April Affidavit established a substantial basis for a finding of probable cause. *Tellez*, 217 F.3d at 550. The Court therefore concludes *a fortiori* that the officers' reliance on the April Affidavit was reasonable. For these reasons, the Court rejects Mr. Santos-Hunter's argument that the evidence should be suppressed because the April Affidavit lacked probable cause.

### B.  *Franks* Challenge

#### 1.    Mr. Santos-Hunter's Claim

Mr. Santos-Hunter contends he is entitled to *Franks* relief because the April Affidavit recklessly omitted the fact that law enforcement did not find other inculpatory communications involving the target Phone Number on Mr. Bankhead's phone. (ECF No. 48 at 17-22; ECF No. 54 at 4-7.) He claims the April Affidavit created a "distorted view of the evidence" because, had it included the fact that Mr. Bankhead's phone showed no text messages or calls from the target Phone Number, the April Affidavit would have suggested that Mr. Santos-Hunter was not actually trafficking controlled substances. (*Id.* at 20.)

Mr. Santos-Hunter likens his case to *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993), in which law enforcement submitted a warrant application stating that a canine "exhibited an

*interest* in only [one] particular package." 986 F.2d at 1233 (emphasis in original).  The warrant application omitted, however, that the canine failed to "alert" to the package.  *Id.*  The Eighth Circuit held this omission constituted reckless disregard for the truth, because "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know."  *Id.* at 1234-1235.  Mr. Santos-Hunter claims that "[l]ike the dog showing interest in but not alerting on the package in *Jacobs*," Investigator Amberg acted with reckless disregard by omitting the lack of incriminating information on Mr. Bankhead's phone, which the issuing judge would wish to know about.  (ECF No. 48 at 21, citing *Jacobs*, 986 F.2d at 1234.)  He contends "recklessness can be presumed" because Mr. Bankhead's phone "was the only source of information that could have connected the target [Phone Number] to drug trafficking.  (ECF No. 54 at 6.)  Mr. Santos-Hunter similarly claims that, if supplemented, the April Affidavit would have been insufficient to support a finding of probable cause.  (*Id.* at 21, citing *Jacobs*, 986 F.2d at 1235.)  He urges the Court to void the April 12, 2023 Warrant and exclude the fruits of the search on these grounds.  (*Id.* at 22, citing *Franks*, 483 U.S. at 156.)

### 2.     Analysis

As a threshold matter, the Court declines to recommend any form of *Franks* relief without first holding a *Franks* hearing.  The Court therefore addresses whether Mr. Santos-Hunter is entitled to a *Franks* hearing on this issue and concludes he is not.  Even if the Court were to supplement the April Affidavit with the fact that Mr. Bankhead's phone did not contain text messages or calls to the target Phone Number, the April Affidavit would establish probable cause.  The Facebook conversation regarding Mr. Santos-Hunter's anticipated "trade" with Mr. Bankhead, Investigator Amberg's knowledge of cellphone usage in a drug trafficking context, and the CI's information that Mr. Santos-Hunter was involved in drug trafficking, were in combination

sufficient to establish a fair probability that Mr. Santos-Hunter was engaged in drug trafficking. That Mr. Bankhead did not *also* text or call Mr. Santos-Hunter on the particular phone seized by law enforcement does not undermine the probable cause finding. For these reasons, Mr. Santos-Hunter's argument that the evidence obtained from the April 12, 2023 Warrant should be suppressed under *Franks* should be rejected, and his Motion to Suppress Evidence (ECF No. 20) should be denied in its entirety.

## IV. Supplemental Motion to Suppress Evidence

### A. *Franks* Challenge

Mr. Santos-Hunter's Supplemental Motion to Suppress Evidence challenges the veracity of Investigator Amberg's statements in the May Affidavit regarding the alleged dog sniff. (ECF No. 48 at 24-38; ECF No. 54 at 8-12.) The May Affidavit includes one paragraph regarding the alleged sniff:

> On May 10th, 2023, DEA Task Force Officer Mark Altendorfer conducted an open-air sniff with his narcotics certified K9 Molly at 11[XXX] Anderson Lakes Parkway. K9 Molly is certified by the National Police Canine Association to detect cocaine, methamphetamine, heroin, MDMA, and marijuana. K9 Molly alerted to the presence of narcotics inside unit #[ZZZ]. K9 Molly did not alert on any other apartments.

Mr. Santos-Hunter argues the alleged sniff never actually occurred, and that K9 Molly therefore did not actually alert to the presence of narcotics. (ECF No. 48 at 26-29.) He also contends the statement about K9 Molly's certification was false (*id.* at 29-30), and the May Affidavit recklessly omitted information about K9 Molly's lack of reliability (*id.* at 30-33). Mr. Santos-Hunter contends that because Investigator Amberg made the false statements in reckless disregard for the

truth, and the statements were essential to the issuing judge's probable cause finding, the Court must suppress evidence from the May 10, 2023 warrant as a remedy under *Franks*. (*Id.* at 24-38.)

### 1.    The Alleged Sniff

Mr. Santos-Hunter argues the record evidence contradicts Investigator Amberg's and Deputy Altendorfer's testimony regarding the alleged sniff, such that a reasonable factfinder would not credit it. (*Id.* at 26.) Mr. Santos-Hunter notes that: (1) Deputy Altendorfer inexplicably did not write a report documenting the sniff until nearly one month after it allegedly occurred; (2) Deputy Altendorfer's report was a single paragraph long and omitted the details to which Deputy Altendorfer testified during the December 29, 2023 evidentiary hearing; (3) there was no entry in K9 Molly's training log recording a deployment on May 10, 2023; (4) contrary to the hearing testimony, the May Affidavit does not indicate Investigator Amberg was present during the sniff, despite repeated declarations regarding his personal involvement elsewhere in the May Affidavit; and (5) there was no audio or video footage to support the alleged sniff. (*Id.* at 27-28.) He argues on these grounds that he has met his burden under *Franks* to show, by a preponderance of the evidence, that the statements in the May Affidavit claiming there was a dog sniff on May 10, 2023 were false. (*Id.* at 29.)

### 2.    K9 Molly's Certification

Mr. Santos-Hunter claims the statement in the May Affidavit that "K9 Molly is certified by the National Police Canine Association to detect cocaine, methamphetamine, heroin, MDMA, and marijuana" was false. (ECF No. 48 at 29, citing Gov. Ex. 2 at 5.) He points to evidence that K9 Molly was actually certified by the United States Police Canine Association. (*Id.*, citing ECF No. 51 at 24; *see also* Govt' Ex. 6.) The Government does not dispute that the May Affidavit

incorrectly identified K-9 Molly's certifying agency, but contends the error was an innocent mistake, which is insufficient to invalidate the warrant.    (ECF No. 52 at 12-14.)

### 3.    K9 Molly's Reliability

Mr. Santos-Hunter further claims the May Affidavit recklessly omitted information that K9 Molly was unreliable.  (ECF No. 48 at 30-33.)  He argues the May Affidavit should have included the fact that, after four months with no narcotics logged as recovered, K9 Molly was required to undergo a reintroduction to odor recognition training just over a month after the sniff at issue, on June 19, 2023 (*id.* at 32-33, citing ECF No. 51 at 46; Gov't Ex. 5 at 11), and that on June 24, 2023, K9 Molly falsely alerted and was required to undergo remedial training (*id.* at 33, citing ECF No. 51 at 41-42, 58; Gov't Ex. 5 at 11).

### 4.    Effect on Probable Cause

Mr. Santos-Hunter argues the false statements and omissions in the May Affidavit satisfy both prongs of the *Franks* test because they were critical to the finding of probable cause.  (ECF No. 48 at 34-38.)  He contends that without the claimed dog sniff, the May Affidavit could not establish a nexus between the Apartment and the alleged distribution of controlled substances.  (*Id.* at 34-35.)  He further contends the misstatement about K9 Molly's certification, together with the omissions related to her unreliability, were essential to establishing probable cause because they affected whether a reasonably prudent person would believe a search based on the alleged sniff would reveal evidence of contraband.  (*Id.* at 36.)

### B.    Analysis

As previously discussed, the Court addresses only whether Mr. Santos-Hunter is entitled to a *Franks* hearing and declines to prematurely recommend any form of *Franks* relief.  The Court finds he is not entitled to such a hearing with respect to his challenges to the statement about K9

Molly's certification or the omissions concerning her unreliability. As to the alleged dog sniff itself, however, the Court finds Mr. Santos-Hunter has met the high burden required to establish entitlement to a *Franks* hearing.

### 1. K9 Molly's Certification and Reliability

While K9 Molly was not certified by the National Police Canine Association on May 10, 2023, she was certified by a different nationally recognized police canine association— the United States Canine Association. (Gov't Ex. 6 at 5-6.) To establish a *Franks* violation, "a defendant must show more than negligence or innocent mistake." *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010). While the statement about K9 Molly's certification may have been inaccurate, the Court cannot conclude it was made in reckless regard of the truth, or that the specific certifying agency alleged in any way influenced the issuing judge's probable cause finding. Because it could not have had any significant bearing on the issuing judge's determination, the Court finds it was an innocent mistake.

The Court similarly declines to conduct a *Franks* hearing on K9 Molly's reliability. To establish a drug dog's reliability, "the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (internal citation omitted). But, "a court may look behind a search warrant when the affiant intentionally or recklessly misleads the magistrate judge by making an affirmatively false statement or [by omitting] material information that would alter the magistrate judge's probable cause determination." *Id.* at 876

(quoting *United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir. 1997) (internal citation omitted)).

The record reflects, that K9 Molly was certified by a nationally recognized police canine association to detect narcotics on May 10, 2023, albeit a different association than the one identified in the May Affidavit. (*See* Gov't Ex. 2, 6.) Mr. Santos-Hunter argues the erroneous statement about K9 Molly's certification is one basis too look behind the search warrant. (ECF No 48 at 30-31.) But since the Court concludes that misstatement was an innocent mistake, it is immaterial to the Court's analysis concerning her reliability. And even if the Court were to consider K9 Molly's past performance, the Court would conclude Mr. Santos-Hunter is not entitled to a *Franks* hearing on that issue. To the extent K9 Molly falsely alerted, failed to detect drugs that may or may not have actually been present in the months prior to alleged May 10, 2023 sniff, or needed to undergo remedial training sometime after the alleged sniff, the law does not require or expect that K9 Molly be perfect; only that she be reliable. The record reflects that K9 Molly was not only properly certified to detect narcotics on the day of the alleged sniff, but she also successfully completed recertification testing the day after the alleged sniff. (Gov't Ex. 6 at 5-6.) For these reasons, the Court finds Mr. Santos-Hunter has not established he is entitled to a *Frank's* Hearing on his challenges to the statements in the May Affidavit regarding K9 Molly's certification or reliability.

### 2.    The Alleged Sniff

The Court finds Mr. Santos-Hunter has made at least a substantial preliminary showing that the May Affidavit may have included recklessly or intentionally false statements about K9 Molly's alleged May 10, 2023 sniff. The only evidence supporting the alleged sniff is Deputy Altendorfer's Sniff Report and the testimony Investigator Amberg and Deputy Altendorfer offered

during the December 29, 2023 evidentiary hearing.  But Mr. Santos-Hunter rightfully points out the conflicts between this evidence and other record evidence.  First, Deputy Altendorfer did not write the Sniff Report until nearly one month after it allegedly occurred—a time gap that is inexplicable and undermines its apparent credibility.  (Gov't Ex. 4.)  Moreover, Deputy Altendorfer testified during the hearing that when K9 Molly positively alerted on May 10, 2023, "[h]er behavior, her respirations, her body language changed and reflected behavior that is consistent with her being in narcotic odor."  (ECF No. 51 at 12:1-12:3).  But his single paragraph Sniff Report omits any of these details.  (Gov't Ex. 4, Sniff Report.)  Further, K9 Molly's detailed training log does not reflect any deployment on May 10, 2023.  (Gov't Ex. 5 at 11.)  Though Deputy Altendorfer testified he does not document every deployment in the log because he is often away from his office (ECF No. 51 32:25-33:4, 57:21-58:9), the log *does* reflect a deployment on May 14, 2023—just four days after the alleged sniff.  (Govt' Ex. 5 at 11.)  Based on the Court's review of the training log (*id*.), deployments resulting in positive alerts appear to have been infrequent.  That Deputy Altendorfer opened the training log file to enter the May 14 deployment without documenting K-9 Molly's noteworthy positive alert on May 10 thus strains credibility. The Court further notes there was no video or audio footage to corroborate the sniff.  (ECF No. 51 at 51:19-52:20.)

Additionally, both Investigator Amberg and Deputy Altendorfer testified to Investigator Amberg's involvement during the alleged sniff.  But the May Affidavit does not indicate Investigator Amberg was present during the sniff, despite Investigator Amberg's repeated declarations elsewhere in the May Affidavit regarding his personal involvement in each aspect of the investigation.  (*See* Gov't Ex. 2.)  Perhaps most concerning is that Investigator Amberg denied documenting the sniff only in the search warrant affidavit, offering sworn testimony to the Court

that he documented K9 Molly's sniff in separate report.  (ECF No. 51 at 98:8-15; 100:11-20.)  But on further questioning he could not identify the alleged other report, recall the date when he wrote it, or even state whether he wrote it before or after Mr. Santos-Hunter's arrest.  (*Id.* at 100:14-20.)  And the Government appears to concede no such report exists.  (ECF No. 52 at 11.)  These discrepancies raise significant doubts about the credibility of the testimony on which the Government's proof that the sniff occurred largely rests.[4]

That K9 Molly positively alerted to narcotics outside the Apartment was critical to the finding of probable cause in the May 10, 2023 Warrant.  The Court agrees with Mr. Santos-Hunter that without the sniff, the nexus between narcotics trafficking and the Apartment was tenuous.  While Mr. Santos-Hunter was observed carrying bags of clothing into the Apartment on one occasion, and electronic monitoring regularly showed him in the area, the dog sniff was critical to establishing the connection between the Apartment and any alleged illegal activity.  Being regularly present in the area of the Apartment and carrying bags of clothes into the Apartment could "describe a very large category of presumably innocent" people "who would be subject to

---

[4] The court makes two additional observations regarding the alleged sniff.  First, the search of the Apartment based on the May Affidavit resulted in the seizure of fentanyl pills, but no other narcotics were found.  K-9 Molly was not certified to detect fentanyl pills, and though Deputy Altendorfer testified he had conducted training with K-9 Molly using fentanyl, there is no information in the record regarding the form of fentanyl used in that training (i.e., powder or pills), or whether K-9 Molly exhibited the capability during the training to detect fentanyl pills at all—much less through a closed apartment door.  Moreover, the location of the fentanyl pills within the Apartment is not in the record, so it is unknown whether the pills were located in the open or hidden away in some sort of airtight container.  The record thus contains no information from which to conclude K-9 Molly actually had the capacity to detect the fentanyl that the officers ultimately found.  These deficiencies in the record are possibly significant insofar as they underscore potential doubt about whether the sniff actually occurred.  Second, the Court observed that Investigator Amberg appeared notably flushed during his testimony at the motions hearing.  In isolation the Court would not find this fact worthy of mention, but the Court notes it because, in context with the discrepancies in the record discussed herein, it might be interpreted as an indication of dishonesty.

virtually random" searches and "seizures were the Court to conclude that [such] little foundation [ ] could justify" a search. *Reid v. Georgia*, 448 U.S. 438, 440-441 (1980). Because the alleged sniff was critical to the probable cause finding, the Court can infer that any false statement was made in reckless regard of the truth. *Mashek*, 606 F.3d at 928. The Court therefore finds Mr. Santos-Hunter satisfies both *Franks* requirements and is entitled to a hearing on the statements in the May Affidavit concerning the occurrence of the dog sniff on May 10, 2023.

During the *Franks* hearing, the Court will determine whether there is sufficient evidence to support the Government's contention that the alleged May 10, 2023 dog sniff occurred, and in turn whether the statements in the May Affidavit concerning the alleged sniff were false. The Court will then determine whether any relief is appropriate. Prior to the hearing, the Court will hold a status conference to discuss the format and issues to be addressed during the *Franks* hearing. Three days before the status conference, the Court directs each party to file a letter brief of up to three pages in length explaining the party's positions regarding the Court's concerns discussed herein and any issues to be addressed in advance of the hearing.

## V.    Motion to Suppress Statements

Mr. Santos-Hunter's Motion to Suppress Statements challenges the admissibility of the statements he made on May 19, 2023 before Investigator Amberg provided him a *Miranda* warning and after he invoked his right to an attorney. (ECF No. 21 at 3.) He claims his statements must be suppressed because law enforcement violated his Fifth Amendment rights by subjecting him to a custodial interrogation before advising him of his *Mirana* rights, and by failing to end the interrogation after he asked for an attorney. (ECF No. 48 at 39-41.)

There is no dispute that Mr. Santos-Hunter was in custody when Investigator Amberg questioned him. But the questions Investigator Amberg asked him before advising him of his

*Miranda* rights were purely biographical, and thus not subject to a *Miranda* warning. *Armstrong*, 39 F.4th at 1056. Investigator Amberg asked Mr. Santos-Hunter his name, age, the address where he was staying, his marital status, whether he was employed and his employer's address, his phone number, and the last grade he completed. (Gov't Ex. 3 at 0:55-2:10.) During the evidentiary hearing, Investigator Amberg testified that he typically asked these questions at the beginning of an interview, and that there was nothing about Mr. Santos-Hunter or this case that made him believe that sort of information was particularly important or relevant. (ECF No. 51 at 77:8-20.)

Mr. Santos-Hunter argues Investigator Amberg should have known questions related to his phone and where he was staying were relevant to his case, and thus those questions constituted custodial interrogation. (ECF No. 48 at 40-41.) But routine questioning is only impermissible if "the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged …." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996). Mr. Santos-Hunter is charged with unlawful possession of firearms, including machineguns, and possession of fentanyl with intent to distribute. (ECF No. 1.) His phone number and residential address are not necessary elements of the charged offenses, nor is the basic biographical information Investigator Amberg sought "directly relevant" to either charged offense. For these reasons, the Court recommends Mr. Santos-Hunter's Motion to Suppress Statements be denied with respect to any statement he made prior to receiving the *Miranda* warning.

The Court similarly concludes that the statements Mr. Santos-Hunter made after he invoked his right to counsel should not be suppressed. Mr. Santos-Hunter claims he remained subject to custodial interrogation after he requested an attorney, but the record reflects that any additional questions asked either were incident to Investigator Amberg's execution of a search warrant to

collect a DNA sample, or in response to Mr. Santos-Hunter's spontaneous statements. Investigator Amberg did ask Mr. Santos-Hunter whether he had ever done a DNA sample before (*id.* at 6:31), but the Court cannot conclude that this question, incident to collecting the sample, was designed to obtain incriminating information. *Armstrong*, 39 F.4th at 1056.

Later, Mr. Santos-Hunter spontaneously asked Investigator Amberg what was happening with "Shaunice's" phone and explained that the owner of the phone wanted it back. (Govt' Ex. 4 at 8:50-9:10.) Investigator Amberg then asked a clarifying question: "Whose phone is it?" (*Id.* at 9:11-9:12.) Mr. Santos-Hunter responded that it was Ms. Dodd's phone. (*Id.* at 9:12-9:14.) Investigator Amberg responded he was probably writing a warrant for the phone and they would figure it out. (*Id.* at 9:14-9:20.) He then asked another clarifying question: whether Mr. Santos-Hunter had "chatted with her." (*Id.*at 9:30.)

Mr. Santos-Hunter contends Investigator Amberg's questions violated his Fifth Amendment right to counsel. But requests for clarification in response to a defendant's spontaneous statement generally do not constitute interrogation. *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005). "A question would constitute interrogation if it attempted to enhance [Mr. Santos-Hunter's] guilt." *Id.* at 445. The Court cannot conclude that any question Investigator Amberg asked in response to Mr. Santos-Hunter's spontaneous statement sought to enhance his guilt rather than address his request that the phone be returned to its owner. For these reasons, the Court also recommends that Mr. Santos-Hunter's Motion to Suppress Statements be denied with respect to any statement he made after he requested an attorney.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

**1.**     Defendant Mario Lazaro Santos-Hunter is entitled to a *Franks* hearing concerning the truth or falsity of the statements in the May Affidavit regarding the occurrence of the alleged dog sniff on May 10, 2023;

**2.**     The court will conduct a status conference in advance of the *Franks* hearing.  The dates of the status conference and the *Franks* hearing will be scheduled by separate order;

**3.**     Three days before the status conference, each party shall file a letter brief of up to three pages in length explaining its positions regarding the Court's concerns as discussed herein and any issues to be addressed in advance of the hearing; and

**4.**     The time between the date of this Order and the final resolution of Defendant's Supplemental Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 33) shall be excluded from the Speedy Trial Act calculations in this case.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Mario Lazaro Santos-Hunter's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 20) and Motion to Suppress Statements, Admissions, and Answers (ECF No. 21) be **DENIED**.


Dated: March 6, 2024                    *s/ Dulce J. Foster*
                                        DULCE J. FOSTER
                                        United States Magistrate Judge

<u>**NOTICE**</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c)