# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-310 (DWF/DJF) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Mario Lazaro Santos-Hunter (1), | |
| Defendant. | |

## INTRODUCTION

This matter is before the Court following a hearing held on May 21, 2024, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (ECF No. 91), and on Defendant Mario Lazaro Santos-Hunter's Supplemental Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Supplemental Motion to Suppress") (ECF No. 33).[1]  Daniel P. Huddleston appeared on behalf of Mr. Santos-Hunter, and Raphael Coburn appeared on behalf of the Government.  (ECF No. 91.) The undersigned considers this matter pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. For the reasons stated below, the Court concludes that no *Franks* violation occurred and recommends that Mr. Santos-Hunter's Supplemental Motion to Suppress be denied.

## BACKGROUND

The Government charged Mr. Santos-Hunter with Possession with Intent to Distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c) ("Count 1"), Illegal Possession of Machine Guns in violation of 18 U.S.C. §§ 922(o)(1) and 924(a)(2) ("Count 2"), and being a Felon

---

[1] Mr. Santos-Hunter filed several other motions that the Court addressed previously.  (*See* ECF Nos. 19, 20, 21, 42, 68, 69, 89.)

in Possession of Firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) ("Count III") ("Indictment") (ECF No. 1).  The charges stem, in part, from a May 10, 2023 warrant to search an apartment allegedly associated with Mr. Santos-Hunter ("Warrant") (Gov't Ex. 2).    On December 20, 2023, Mr. Santos-Hunter moved to suppress all evidence found pursuant to the Warrant and requested a *Franks* hearing on the ground that the affidavit supporting the Warrant ("Affidavit") contained substantial false statements.  (ECF No. 33.)   Mr. Santos-Hunter also argued that the Warrant lacked probable cause.  (*Id*.)  Upon conducting an evidentiary hearing and reviewing the parties' post-hearing briefing, the Court concluded that Mr. Santos-Hunter was entitled to a *Franks* hearing on the veracity of certain statements contained in the Affidavit.  (ECF No. 67.)

A.    **The Affidavit**

On May 10, 2023, Investigator Cody L. Amberg applied for and obtained the Warrant, which authorized law enforcement officers to search an apartment located on Anderson Lakes Parkway in Eden Prairie, Minnesota ("Apartment"), and to seize assorted items including cell phones, records, firearms, paraphernalia, and money.  (Gov't Ex. 2.)  The Warrant application included a supporting detailed Affidavit.  (*Id*. at 2-7.)  The Affidavit explained that Investigator Amberg had been a police officer since 2014 and had extensive training related to the illegal possession and trafficking of controlled substances.  (*Id*. at 2.)   The Affidavit also detailed Investigator Amberg's investigation into a drug trafficking ring that allegedly had trafficked tens of thousands of M30 fentanyl pills from Arizona for distribution in Minnesota.  (*Id*. at 2-4.) According to the Affidavit, the investigation focused on three individuals—Quijuan Bankhead, Robiel Williams, and Montez Chandler, Jr.—and spanned from August 2022 through at least February 2023.  The investigation included: the use of a confidential informant ("CI"); electronic

tracking; the interception of a postal package with 49,000 fentanyl pills in it; and a search of Mr. Bankhead's home and cell phone on February 27, 2023.  (*Id.* at 3-4.)

According to the Affidavit, cell extraction data from Mr. Bankhead's cell phone seized on February 27 contained "numerous drug-related conversations" with various individuals, including a Facebook conversation with Facebook user "Mario Santos" that appeared to refer to a drug trade. A CI linked Mr. Santos-Hunter to the "Mario Santos" Facebook username and confirmed his identity based on a photograph.  The CI also showed investigators other photographs of Mr. Santos-Hunter posing with large amounts of currency and told investigators Mr. Santos-Hunter was involved in narcotics distribution.

The Affidavit also explained that, based on GPS location data obtained through a prior warrant, "electronic surveillance routinely placed [Mr. Santos-Hunter] in the area" of the apartment complex where the Apartment is located ("Apartment Complex").  (*Id.* at 5.)  The Affidavit further explained that commercial records showed a phone number Mr. Santos-Hunter was using "was subscribed to a Shaunice Marie Dodd" and this "real-time commercially available check" revealed Ms. Dodd resided at the Apartment.  (*Id.* at 4.)  The Affidavit stated that on April 27, 2023, the property director of the Apartment Complex confirmed Mr. Santos-Hunter had a child with Ms. Dodd, regularly stayed at Ms. Dodd's Apartment, and routinely drove her black Lincoln Sedan.  (*Id.* at 5.)  The Affidavit also stated that on May 9, 2023, electronic surveillance showed Mr. Santos-Hunter carrying numerous bags and clothing to the third floor of the Apartment Complex.  (*Id.*)

The Affidavit further provided that on "May 10, 2023, DEA Task Force Deputy Mark Altendorfer conducted an open-air sniff with his narcotics certified K9 Molly at [the Apartment Complex]."  (*Id.*)  The Affidavit stated that K9 Molly alerted to the presence of narcotics outside

the Apartment, but she did not alert on any adjacent apartments. (*Id.*) Though Investigator Amberg authored the Affidavit, which included numerous allegations detailing his personal involvement in the investigation, it did not suggest he was present for K9 Molly's sniff outside the Apartment. (*See* Gov't Ex. 2 at 2-7.)

The Affidavit also stated that "K9 Molly is certified by the National Police Canine Association" to detect narcotics. (*See id.* at 2-7.) The record reflects that K9 Molly was not certified by the National Police Canine Association on May 10, 2023; rather, she was certified by the United States Police Canine Association at that time, and she was recertified by the same association on the day after the alleged sniff. (Gov't Ex. 6 at 5-6.)

Based on application and supporting Affidavit, Hennepin County District Judge Peter A. Cahill issued the Warrant on May 10, 2023 (*id.* at 9-11), and law enforcement officers executed it on May 18, 2023 (ECF No. 51 at 79, Motions Hearing Testimony). During the search, officers located three firearms, a small amount of cocaine and a bag of M30 pills containing fentanyl. (*Id.;* ECF No. 93 at 87-90, 118, 122.)

**B.    December 29, 2023 Hearing Testimony Regarding the Sniff**

During the motions hearing on December 29, 2023, Deputy Altendorfer testified regarding K9 Molly's alleged May 10, 2023 positive alert for narcotics. (ECF No. 51 at 9-12.) Deputy Altendorfer testified that he "gave the command to K9 Molly to seek dope," after which "[s]he entered the hallway, crossed the hallway to the other side, checked an unrelated address door with no indication, made her way down toward the target residence …." (*Id.* at 11:13-16.) According to Deputy Altendorfer, "[a]s she was passing the door, she caught an odor that she then started coming back toward the target residence door to.[2] When she got back to that door, she continued

---

[2] As reflected in the hearing transcript.

to narrow her smelling area so that she got to the door seam and then sat," which Deputy Altendorfer explained was a positive alert to a narcotic odor. (*Id.* at 11:16-11:20; 12:4-8.) Deputy Altendorfer testified that when K9 Molly turned toward the door "[h]er behavior, her respirations, her body language changed and reflected behavior that is consistent with her being in narcotic odor." (*Id.* at 12:1-12:3.)

Deputy Altendorfer did not write a report documenting the alleged sniff until June 14, 2023—more than a month after it allegedly occurred. (*Id.* at 53:17-19; *see also* Gov't Ex. 4, "Sniff Report".) His Sniff Report, in its entirety, states the following:

> On May 10, 2023 I, Deputy Altendorfer, deployed my canine partner Molly at [the Apartment] for an open air sniff of the common area of the building. Officer Amberg, I and canine Molly entered the multi unit residential complex and I directed canine Molly to, "Seek Dope". As we navigated to the suspected residence of [the Apartment] canine began checking for the presence of narcotic odor coming from the apartments. As we approached [the Apartment], canine Molly alerted to the presence of narcotic odor coming from [the Apartment]. During the open air sniff canine Molly only alerted to [the Apartment]. K9 Molly is certified by the United States Police Canine Association as recently as May 2023.

Deputy Altendorfer conceded during his testimony that this single paragraph Sniff Report does not discuss K9 Molly's respirations or describe how her behavior changed in the hallway. (ECF No. 51 at 55:17-19. 56:7-12; *see also* Gov't Ex. 4, Sniff Report.)

Deputy Altendorfer also testified he maintains a detailed log of K9 Molly's training exercises and deployments, but he admitted this log does not include an entry recording any deployment on May 10, 2023. (ECF No. 51 at 22:3-4; *see also* Gov't Ex. 5, K9 Molly's "Training Log".) He testified he does not log every training session or deployment because, "'[l]ogistically, it is sometimes difficult to get every single deployment on the logs, just due to the nature of my ancillary duties." (ECF No. 51 at 21:14-16.) He explained that he spends very limited time in the office in front of his computer, and he can only update the deployment log from his computer at

the office.  (*Id.* at 32:25-33:4, 57:21-58:9.)  He testified that logging a training or deployment requires him to type information into a spreadsheet, but conceded he logged a deployment on May 14, 2023 resulting in no positive findings—just four days after K9 Molly's alleged deployment at the Apartment—and did not update the log to include the more important positive alert described in his Sniff Report authored a month later.  (*Id.* at 31:15-17, 64:14-16; *see also* Gov't Ex. 5 at 11, K9 Molly's Training Log.)  Deputy Altendorfer further testified there is no video or audio footage of the alleged sniff on May 10, 2023.  (ECF No. 51 at 51:19-52:20.)

During the hearing, defense counsel questioned Deputy Altendorfer about K9 Molly's training and capabilities.  Deputy Altendorfer testified that in the months following the alleged sniff, K9 Molly underwent a reintroduction to odor recognition training and was required to participate in remedial training after falsely alerting in training on substances she was not trained to detect.  (*Id*. at 46:6-12.)  Deputy Altendorfer further acknowledged K9 Molly is not certified to detect fentanyl, but he stated he had used fentanyl in non-blinded training exercises with her.  (*Id.* at 28:23-25; 29:9-30:6.)

Both Deputy Altendorfer and Investigator Amberg testified that Investigator Amberg was present during the alleged sniff at the Apartment.  (*Id.* at 60:4-9; 98:8-11.)  Investigator Amberg said he saw K9 Molly "sit at the door" outside the Apartment to indicate the presence of narcotics but that she did not alert on any other apartments.  (*Id.* at 68:16-69:3.)  When asked when he documented K9 Molly's sniff, he said he documented it on May 10, 2023, the date of he wrote the search Warrant.  (*Id.* at 98:8-15.)  Investigator Amberg denied that the Affidavit was the only place he documented the sniff, stating vaguely that he also wrote about it in a "report".  (*Id.* at 100:11-13, "Q.  Investigator Amberg, the only place you documented the dog sniff was in the search warrant you wrote?  A. No. It was documented in the report as well.")  On questioning, however,

6

he could not identify the report with specificity. He could not recall the exact date he wrote the report, or whether he wrote it before or after Mr. Santos-Hunter's arrest. (*Id.* at 100:14-20, "I don't know the exact date when I wrote that, no.".)

Notwithstanding Investigator Amberg's testimony that he documented the sniff in a report, the Government's post-hearing brief in opposition to the suppression motion suggested—by its striking omissions—that no such report existed:

> [T]his dog sniff was documented in two ways: (1) Investigator Amberg described the dog sniff that he personally observed in the May 10 warrant affidavit on the same day the sniff occurred; and (2) Deputy Altendorfer drafted a report describing the dog sniff and K9 Molly's alert to the presence of narcotic odor.

(ECF No. 52 at 11.)

### C.    The Court Orders a *Franks* Hearing

On March 6, 2024, the Court ordered a *Franks* hearing to address whether statements in the Affidavit about K9 Molly's alleged sniff were false. (ECF No. 68 at 27-30.) The Court cited several areas of concern to supports its conclusion that Mr. Santos-Hunter made a substantial preliminary showing that the Affidavit included recklessly or intentionally false statements about the alleged sniff: (1) Deputy Altendorfer did not write a report documenting K9 Molly's alleged sniff until over a month after it occurred; (2) Deputy Altendorfer's report did not mention his observations regarding K-9 Molly's behavior consistent with detection of narcotic odor; (3) Deputy Altendorfer's deployment log did not reflect a deployment on May 10, 2023, but it did reflect a less significant deployment a few days later; (4) there is no video or audio footage of the sniff; (5) the Affidavit does not indicate that Investigator Amberg was present at the sniff; (6) Investigator Amberg testified he wrote a report documenting K9 Molly's alleged sniff but could not recall when he wrote it, and the Government's post-hearing briefing suggested no such report

existed; (7) the record is unclear as to whether K9 Molly could detect fentanyl; and (8) Investigator

Amberg appeared flushed during his testimony at the December 29, 2023 motions hearing.  (*Id.*)

### D.    *Franks* Hearing Testimony and Evidence

The Court held the *Franks* hearing on May 21, 2024.  (ECF No. 91.)  Five law enforcement

officers testified during the hearing:  Sergeant Samantha Jermone, Commander Neil Fredericks,

Officer Dennis Cook, Deputy Mark Altendorfer, and Investigator Cody Amberg.  The Court also

received multiple Government and Defense Exhibits into evidence and ordered post-hearing

briefing (ECF Nos. 98, 100, 101).

### 1.    Sergeant Samantha Jerome

Sergeant Jerome testified that she supervised both Investigator Amberg and Deputy

Altendorfer in May 2023 in her role as a sergeant with the Violent Crime Enforcement Team

("VCET") at the Ramsey County Sheriff's Office.  (ECF No. 93 at 6:4-6:5, 6:25-7:8.)  She

explained that VCET policy requires officers to inform their supervisors when they leave Ramsey

County for work (*id.* at 7:12-19).  Consistent with that policy, on May 9, 2023 Investigator Amberg

informed her he would be conducting a dog sniff the next day in Eden Prairie with Deputy

Altendorfer and Dennis Cook, an investigator assigned to VCET through the Roseville Police

Department.  (*Id.* at 8:1-21.)

Sergeant Jerome testified that on the morning of May 10, 2023, she informed two other

VCET sergeants and her commander about the dog sniff.  (*Id.* at 8:25-9:6.)  At 7:41 a.m. on

May 10, 2023, she sent a text message to the VCET sergeants and her commander stating,

"Amberg and Denny will be at [the Apartment Complex] this morning doing surveillance.

Altendorfer is meeting them around 0900ish to do a sniff[.]"  (Gov't Ex. 11.)  Sergeant Jerome

testified that "Amberg" refers to Investigator Amberg, "Denny" refers to Dennis Cook, and "Altendorfer" refers to Deputy Altendorfer." (ECF No. 93 at 10:6-10:14.)

Sergeant Jerome also testified that as Investigator Amberg and Deputy Altendorfer's supervisor, she had access to records related to the use of their work-issued phones. (*Id.* at 10:19-10:13.) Those records reflect that on the morning of May 10, 2023, Deputy Altendorfer called Investigator Amberg twice—once at 9:22 a.m. and again at 9:27 a.m.—with both calls originating from Eden Prairie. (Gov't Exs. 13, 14.) The records also reflect that Investigator Amberg called Officer Cook at 9:25 a.m. on May 10, 2023, and Officer Cook called him back at 9:35 a.m., with both calls originating from Eden Prairie. (Gov't Ex. 14.) Sergeant Jerome testified that Deputy Altendorfer, Investigator Amberg, and Officer Cook did not regularly work in Eden Prairie. (ECF No. 93 at 13:14-17, 15:3-15:6.)

Finally, Sergeant Jerome testified that VCET generates an audit trail that tracks information about its police reports. (*Id.* at 15:7-15:19.) She said the audit trail associated with this case reflects that Investigator Amberg created a report on May 10, 2023. (*Id.* at 15:7-16:25; *see also* Gov't Ex. 12.)

## 2.    Commander Neil Fredericks

Commander Neil Fredericks testified that he works as a commander in the patrol division of the Ramsey County Sheriff's Office. (ECF No. 93 at 21:10-22:3.) He explained that his responsibilities include overseeing the office's records unit and reviewing the VCET's reports to make sure they conform to the National Incident-Based Reporting System. (*Id.* at 22:3-22:13.) Commander Fredericks testified that an audit report (Gov't Ex. 15) shows Investigator Amberg created a narrative record on May 10, 2023 at 5:40 p.m. (ECF No. 93 at 24:20-26:13; Gov't Ex. 17.) The narrative record documents the alleged sniff. (Gov't Ex. 17 at 5.) Commander

Fredericks explained that although Investigator Amberg manually entered a report date of April 1, 2023, the automated system shows he actually created the report on May 10, 23 at 5:40 p.m. (ECF No. 93 at 25:15-26:18.)

### 3.    Officer Dennis Cook

Officer Cook testified that at the time of the *Franks* hearing, he was employed as a patrol officer with the Roseville Police Department (ECF No. 93 at 30:11-30:13), but for most of 2023, he worked as an investigator with VCET handling narcotics cases (*id.* at 30:23-31:3). He testified that on May 10, 2023, he assisted Investigator Amberg and Deputy Altendorfer with a dog sniff at [the Apartment Complex] in Eden Prairie, Minesota. (*Id.* at 31:19-31:25.) Officer Cook explained that he conducted surveillance outside the Apartment building from the parking lot and that he had a direct line of sight on the building. (*Id.* at 32:7-32:25.) He explained that he was not wearing a body camera at the time because he was present in an undercover capacity. (*Id.* at 33:18-33:21.) He testified that he personally observed Investigator Amberg, Deputy Altendorfer, and K9 Molly enter the building and exit a short time later. (*Id.* at 34:16-34:23.) Officer Cook said he specifically remembered that K9 Molly "went to the bathroom on the grass outside" before entering the building (*id.* at 34:20-34:22), and that the group was inside the building for approximately 5-10 minutes (*id.* at 35:3-35:5). Officer Cook further testified that when he spoke to Investigator Amberg later that day, Investigator Amberg told him K9 Molly had positively alerted inside the building. (*Id.* at 35:6-35:16.) Officer Cook testified that he did not write a report documenting the surveillance he conducted on May 10, 2023 (*id.* at 38:11-38:15), largely because he was not the primary agent on the case (*id.* at 43:16-44:7).

### 4.    Deputy Mark Altendorfer

Deputy Altendorfer testified that he communicated with Investigator Amberg both the day before the sniff and on the morning of May 10.  (ECF No. 93 at 46:23-47:6.)  The Government offered these communications into evidence during the *Franks* hearing.  At 7:41 p.m. on May 9, 2023, Investigator Amberg sent Deputy Altendorfer a text identifying the address for the dog sniff.  And at 8:54 a.m. on May 10, 2023, Deputy Altendorfer sent a text message to Investigator Amberg stating his estimated time of arrival at [the Apartment Complex] was 9:30, to which Investigator Amberg replied, "Copy."  (Gov't Exs. 16, 18.)

Deputy Altendorfer testified that Officer Cook was present in the parking lot at [the Apartment Complex] on May 10, 2023, performing surveillance.  (ECF No. 93 at 49:6-49:18.)  He said Officer Cook did not wear a body camera during the dog sniff because "the public display of a body camera would indicate that I am law enforcement and I was doing law enforcement activities within the apartment complex."  (*Id.* at 49:25-50:7.)

Deputy Altendorfer testified that his training and deployment log did not fully and accurately capture all the deployments he performed in May 2023, in part because he was working overtime and conducting 8-12 deployments with K9 Molly on a typical day.  (*Id.* at 50:8-50:25.)  He conceded that his failure to maintain an accurate log was not a "best practice" (*id.* at 51:11-51:13), but said the omission of any entry for a deployment on May 10, 2023 did not mean he did not deploy K9 Molly on that day (*id.* at 51:14-51:16).

Deputy Altendorfer reiterated his prior testimony that K9 Molly did in fact positively alert to the presence of narcotics outside the Apartment on May 10, 2023.  (*Id.* at 51:17-51:22.)  He testified that K9 Molly's sniff on May 10, 2023 stood out in his mind for several reasons, including: (1) it was the only sniff he ever conducted in Eden Prairie (*id.* at 72:2-72:4); (2) he had never been

to the Apartment Complex before (*id.* at 72:4-72:6); and (3) the positioning of the Apartment and its proximity to the stairwell were memorable (*id.* at 72:6-72:7).

Deputy Altendorfer also testified extensively about K9 Molly's narcotics detection capabilities. He said as of May 2023, K9 Molly was trained to detect, and had shown an ability to successfully detect fentanyl, including fentanyl in M30 pill form. (*Id.* at 52:18-52:22; 53:6-53:22.) Deputy Altendorfer testified that K9 Molly was not certified to detect fentanyl in May 2023 because no such certification existed. (*Id.* at 53:23-54:4.) He explained that the lack of available certification was not because fentanyl detection was based on unproven training or because dogs could not reliably detect fentanyl (*id.* at 68:22-69:2; 69:10-69:16), but because of "the dangers associated with using fentanyl and the hazards associated with mishandling it or risks associated to the dog or the handler or the lead trainer who is going to be putting that out" (*id*. at 72:18-73:2).

Deputy Altendorfer also testified that K9 Molly's sense of smell is somewhere between 10,000 and 100,000 times more powerful than that of a typical human (*id.* at 55:5-56:20), and that in her training she has shown the ability to detect residual narcotic odor even when no narcotics are present (*id.* at 56:21-57:13). He further explained that design and pressurization makes it easier for K9 Molly to detect odor emanating from doorways in apartment buildings. (*Id*. at 57:14-57:22.)

Finally, Deputy Altendorfer testified that packaging does not stop K9 Molly from detecting narcotic odor. (*Id.* at 58:1-58:5.) He explained that K9 Molly had successfully completed training on the detection of narcotic odor through packaging and also demonstrated the ability to detect packaged narcotics in the field. (*Id*. at 58:11-58:25.) Removing narcotics from their packaging

would increase the amount of narcotic odor present and make it easier for K9 Molly to detect it, however.  (*Id.* at 59:1-59:17.)

### 5.    Investigator Cody Amberg

Investigator Amberg confirmed his prior testimony that the alleged drug sniff cited in his Affidavit took place on May 10, 2023.  (*Id.* at 91:9-91:3.)  He also reiterated that he drafted a report documenting K9 Molly's sniff and further testified that he drafted it on the same date.  (*Id.* at 79:9-79:22.)  Investigator Amberg explained that although the report references April 1, 2023, he manually entered that date to reflect when he had received forensic phone data and criminal informant information from the investigation involving Mr. Bankhead.  (*Id.* at 79:23-80:14; *see also* Gov't Ex. 17 at 1.)  Investigator Amberg said the report he authored on May 10, 2023 (Gov't Ex. 17) was the report about which he testified during the December 29, 2023 motions hearing. (ECF No. 93 at 96:4-96:8.)  He explained that the report is identical to his Affidavit.  (*Id.* at 96:9-97:1.)

Investigator Amberg also testified that on May 10, 2023, Officer Cook was stationed outside the Apartment Complex conducting surveillance while Investigator Amberg, Deputy Altendorfer, and K9 Molly went inside to conduct a sniff.  (*Id.* at 81:5-81:23.)  He explained that there was no audio or video footage of the sniff because the officers were working undercover in light of Mr. Santos-Hunter's "known firearm history."  (*Id.* at 83:23-84:11.)

### DISCUSSION

## I.    No *Franks* Violation

The Fourth Amendment requires that a search warrant must be supported by probable cause.  *Illinois v. Gates*, 462 U.S. 213, 236–39 (1983).  "A search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit containing false or omitted

statements made knowingly and intentionally or with reckless disregard for the truth." *United States v. Conant*, 799 F.3d 1195, 1199 (8th Cir. 2015) (quoting *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). Such a challenge is referred to as a *Franks* challenge based on the test set forth in *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "To prevail on a *Franks* claim the defendants must show: (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining content is insufficient to establish probable cause." *Reinholz*, 245 F.3d at 774. "The same analysis applies to omissions of fact. The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Id.* "A showing of deliberate or reckless falsehood is not lightly met." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010) (quotations omitted).

### A.      The Alleged Sniff

The Affidavit states that "K9 Molly positively alerted to the presence of narcotics inside [the Apartment]. K9 Molly did not alert on any other apartments." (Gov't Ex. 2 at 6.) Mr. Santos-Hunter maintains this statement his false. (ECF No. 98 at 7-15.) He argues that "the question of whether K9 Molly alerted at the apartment door come[s] down to the credibility of just two officers: Investigator Amberg and Deputy Altendorfer," and their testimony is not credible, largely because it contradicts what they did or did not write in their reports. (ECF No. 101 at 2; *see also* ECF No. 98 at 7-15.) He further contends the evidence the Court admitted at the *Franks* hearing "bear[s] only on whether the officers went to the apartment complex that day" and discounts the other witnesses' testimony as failing to "speak to what did or did not happen in the apartment complex." (ECF No. 101 at 2-3.)

14

Mr. Santos-Hunter argues Deputy Altendorfer's failure to contemporaneously document K9 Molly's alleged May 10, 2023 sniff—either in a report or his training log—undermines his credibility. (ECF No. 98 at 9-10.) He also questions the accuracy of Deputy Altendorfer's memory since Deputy Altendorfer did not document the sniff until June 2023 after a busy deployment schedule (*id.* at 10-12; *see* Gov't Ex. 4), and points out that Deputy Altendorfer's testimony "went beyond his paragraph-long report that was not written until a month after the alleged sniff" (ECF No. 101 at 5; *see also id.* at 6-7). Mr. Santos-Hunter discounts Deputy Altendorfer's claim that the alleged sniff stood out in his mind and argues, "[I]f the sniff stood out in his memory for specific reasons, it would stand to reason that he would be more likely to record those details in his report or his log. Instead, his report had little detail, and the log had no entry." (ECF No. 98 at 11; *see also* ECF No. 101 at 7.)

Mr. Santos-Hunter also emphasizes that neither the Sniff Report nor K9 Molly's training log references K9 Molly's training or ability to detect fentanyl. (ECF No. 101 at 6.) He argues, "In light of these inconsistencies between Deputy Altendorfer's report and his testimony, his failure to document the alleged sniff for more than a month, the absence of the alleged sniff from his deployment log, the lack of documentation of K9 Molly training with fentanyl, and the claimed basis for remembering this sniff, Deputy Altendorfer's testimony was not credible." (*Id.* at 8.)

Mr. Santos-Hunter further contends, "Investigator Amberg's testimony about the alleged dog sniff was not credible because he claimed to have been present for the sniff, despite filing a warrant affidavit and writing an identical report in which he did not say he was present for the sniff." (ECF No. 101 at 3, citing Gov't Ex. 2 at 5; Gov't Ex. 17 at 3.) Mr. Santos-Hunter points to other parts of the Affidavit where Investigator Amberg clearly denoted his personal involvement in the investigation, arguing Investigator Amberg's omission of any reference to his personal

involvement in the alleged dog sniff contradicts both Investigator Amberg and Deputy Altendorfer's testimony that Investigator Amberg was present. (ECF No. 101 at 3-4.) Mr. Santos-Hunter speculates that Investigator Amberg altered his testimony only after reading Deputy Altendorfer's Sniff Report. (ECF No. 98 at 13.)

Mr. Santos-Hunter also argues the existence of the report Investigator Amberg claimed to have written on May 10, 2023 is minimally significant because "[t]he report did not provide any additional information about the alleged dog sniff beyond what was already in the search warrant affidavit." (ECF No. 101 at 4.) He contends the report should have been a "fuller record of the investigation—one where Investigator Amberg would be expected to identify what investigative steps he took and what he witnessed," so his failure to include in his report that he was present for the alleged sniff "is strong evidence that both officers lied to the Court about the sniff and alert occurring." (*Id.* at 4-5.)

Mr. Santos-Hunter also makes much of the lack of audio or video footage of the alleged sniff and argues the Court cannot conclude whether K9 Molly actually alerted to the presence of narcotics or reacted for some other reason. (ECF No. 98 at 7-9; *see also* ECF No. 101 at 8-10.) He contends that the "choice not to capture video documentation of critical stages of the investigation was not limited to May 10," and that officers also prematurely turned off their cameras during the execution of the search, impeding later oversight. (ECF No. 98 at 9.) Mr. Santos-Hunter rejects the explanation that the officers did not wear body cameras in an effort to be discreet, because certainly "walking a trained K9 up to an apartment door to sniff is an activity traditionally done by law enforcement." (ECF No. 101 at 8-9.) He further speculates that, had the sniff occurred, video cameras in the apartment complex would have captured at least part of it. (*Id.* at 8-9.)

B.    **Analysis**

Although the Court found Mr. Santos-Hunter satisfied the initial burden to obtain a *Franks* hearing, the additional testimony and evidence proffered during that hearing alleviate the Court's concern that a *Franks* violation may have occurred.   Specifically, the Court now finds that: (1) although Deputy Altendorfer did not write a report documenting K9 Molly's sniff until approximately one month after it occurred, did not log a deployment on May 10, 2023, and  initially testified to details omitted from his report, corroborating testimony and evidence now support that the sniff did, in fact, occur; (2) Officer Cook, Investigator Amberg and Deputy Altendorfer's corroborating explanation as to why no video or audio footage of the sniff exists is satisfactory; (3) Investigator Amberg wrote a report documenting the alleged sniff, and corroborating testimony and evidence support a finding that he was present for the sniff; and (4) K9 Molly was sufficiently trained and able to detect fentanyl.[3]   In particular, the Court finds persuasive: (1) the detailed, corroborating and credible testimony of Officer Cook regarding his observations at the Apartment Complex and the rationale for not recording the sniff; (2) the text messages and phone records establishing that Deputy Altendorfer, Investigator Amberg and Officer Cook communicated with each other on May 9 and May 10, 2023—including messages identifying the address of the Apartment Complex—and that on May 10 they worked from a location in Eden Prairie; (3) the testimony of supervising Sergeant Jerome that on May 9, 2023, Investigator Amberg informed her he would be conducting a dog sniff the next day in Eden Prairie with Deputy Altendorfer and Officer Cook; (4) the text message from Sergeant Jerome on the morning of May 10, 2023 to other

---

[3] The record reflects that during the search of the Apartment on May 18, 2023, officers seized both fentanyl and cocaine (ECF No. 93 at 84, 87), and that Molly was certified to detect cocaine (Gov't Ex. 6).  Given these facts, whether Molly was certified or capable of detecting fentanyl appears to be of marginal importance.

17

VCET sergeants and her commander stating, "Amberg and Denny will be at [the Apartment Complex] this morning doing surveillance.  Altendorfer is meeting them around 0900ish to do a sniff[.]"; (5) the audit trail associated with this case reflecting that Investigator Amberg created a report on May 10, 2023; (6) the Government's introduction into evidence of Investigator Amber's report, which counsel did not previously offer or acknowledge existed; and (7) Deputy Altendorfer's credible, in-depth testimony about K9 Molly's narcotics detection capabilities, including her ability to detect fentanyl in M30 pill form and residual narcotic odor, and his explanation that, although she was capable of detecting fentanyl, she was not certified for that narcotic because such a certification did not exist.

Mr. Santos-Hunter asks the Court to conclude the alleged sniff did not occur based on when and what Investigator Amberg and Deputy Altendorfer did or did not write in their reports documenting the sniff, and on speculation that one or both of them lied on the stand and neither can be trusted.  (*See* ECF Nos. 98, 101.)  But the overwhelming evidence now before the Court, including the above-cited corroborating electronic records and testimony from three other law enforcement agents, far outweighs the significance of the officers' deficient documentation practices and resolves—in the negative—the question of whether Investigator Amberg falsely testified about the existence of his May 10, 2023 report.  Certainly, Investigator Amberg's failure to create a more comprehensive police report documenting the sniff, and Deputy Altendorfer's failure either to contemporaneously document K9 Molly's May 10, 2023 sniff in a report or note it in his training log, were not best practices.  But the Court cannot conclude from the officers' poor documentation practices that they both lied under oath.  "A showing of deliberate or reckless falsehood is not lightly met." *Butler*, 594 F.3d at 96.  In light of the abundant evidence to the contrary, Mr. Santos-Hunter has not satisfied his burden of establishing that the Affidavit contains

any false statement made knowingly and intentionally, or with reckless regard for the truth. *Reinholz*, 245 F.3d at 774. Because the Court finds the Affidavit's statements regarding the dog sniff include no actionable falsehood, it need not address whether the remainder of the Affidavit is alone sufficient to establish probable cause.

## II.    Probable Cause

Having found no *Franks* violation, and therefore that the Warrant is facially valid, the Court turns to whether the Affidavit established probable cause for the search. The Fourth Amendment dictates that "no warrants shall issue, but upon probable cause." The standard for determining whether a search warrant is supported by probable cause is well established:

> Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances. If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established.

*United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016) (quotations and citations omitted). A drug "dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999).

"An issuing judge's 'determination of probable cause should be paid great deference by reviewing courts' and should be upheld if the judge had a 'substantial basis for … conclud[ing] that a search would uncover evidence of wrongdoing.'" *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (alterations in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When "the issuing judge relied only on the affidavit submitted with the warrant application to issue the warrant, a reviewing court may only use the information 'found within the four corners of the affidavit' in determining if probable cause existed." *United States v. Eggerson*, 18-cr-110

(DWF/KMM), 2018 WL 6520648, at *3 (D. Minn. Sept. 27, 2018) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)), *report and recommendation adopted*, 2018 WL 5962481 (D. Minn. Nov. 14, 2018), aff'd, 999 F.3d 1121 (8th Cir. 2021). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citation omitted). "However, judges are permitted to 'draw reasonable inferences from the totality of the circumstances' when making the probable cause determination." *Id*. (quoting *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017)).

Mr. Santos-Hunter argues that without the claimed dog sniff, the Warrant lacked probable cause because the Affidavit cannot establish a nexus between the Apartment and the alleged distribution of controlled substances. (*See* ECF No. 33 at 8; ECF No. 52 at 34-35.) And though he previously challenged K9 Molly's reliability (ECF No. 36), the Court has already found this argument to be unavailing. (ECF No. 67 at 27.) Because the Court finds K9 Molly was reliable, and that she did in fact positively alert to narcotics outside the Apartment, the Court concludes there was sufficient probable cause to support the Warrant. *Sundby*, 186 F.3d at 875-76. The Court therefore recommends that Mr. Santos-Hunter's Supplement Motion to Suppress Evidence (ECF No. 33) be denied.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Mario Lazaro Santos-Hunter's Supplemental Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. [33]) be **DENIED**.

Dated: July 26, 2024

*s/ Dulce J. Foster*
DULCE J. FOSTER
United States Magistrate Judge

20

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c)